**E-FILED**
Thursday, 25 February, 2016  11:23:27 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DONALD L. DIPPEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-3323 |
| | ) | |
| CAROLYN C. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Donald L. Dippel appeals from the denial of his application for Supplemental Security Income Disability Benefits (SSI) under Title XVI of the Social Security Act. 42 U.S.C. §§ 1381a and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Dippel has filed a Motion for Summary Judgment (d/e 13), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 16). The matter is before this Court for a Report and Recommendation. For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be AFFIRMED.

## STATEMENT OF FACTS

Dippel was born on September 18, 1965.  He completed the tenth grade.  He worked in the past as an assembler, but had no past relevant work.  Certified Transcript of Proceedings before the Social Security Administration (d/e 8) (R.), 20, 32, 196, 202-13.  He applied for SSI on November 16, 2011.  Dippel suffered from cervical degenerative disc disease with radiculopathy into the bilateral extremities, and ischemic heart disease.  R. 11, 13.

On February 28, 2010, Dippel was in an altercation at a bar at which time he had non-radiating chest pain.  He thereafter went to the emergency room with complaints of chest pain and right hand pain.  He had a history of a heart condition (stents placed in his heart in November 2008) and a prior right hand fracture.[1]  His blood alcohol level was .272.  He was kept for observation overnight and released.  R. 263.

On March 10, 2010, Dippel saw Physician's Assistant Phil Shils at the Community Health Improvement Center (Center) in Decatur, Illinois, for a follow-up on his emergency room visit.  He described the pain in his hand

---

[1] Dippel cited the March 10, 2010 visit medical record as evidence of the emergency room visit and the right hand fracture.  Brief in Support of Motion for Summary Judgment (d/e 14), at 2 (citing R. 263). The March 10, 2010 medical record does not identify the emergency room visited.  The note is also somewhat ambiguous in that Dippel may have broken his hand in the February 28 altercation in the bar or he may have broken it sometime before that incident.  The most reasonable reading of the note is that the fracture occurred sometime earlier.

as 9 out of 10.  His right hand had mild swelling and some discoloration in the digits.  He reported that he was taking Vicodin for the pain.  He had shortness of breath on exertion.  Shils prescribed Tylenol 3 for the pain. R. 263.

On January 27, 2011, Dippel went to the emergency room at Decatur Memorial Hospital in Decatur, Illinois (Emergency Room).  Dippel complained of pain in his right hand.  On examination, Dippel had mild tenderness in the right wrist and forearm, good range of motion in the right elbow, right wrist and in all of his fingers on his right hand.  His sensation and motor function was intact.  X-rays showed no fracture, but showed chronic posttraumatic changes in the fifth metacarpal consistent with the prior fracture that had healed.  He was diagnosed with a sprained hand and released.  R. 385, 388.

On October 27, 2011, Dr. Dana Ray, M.D., from the Center ordered an MRI of Dippel's cervical spine.  Dippel had complained of neck pain, right arm numbness, tingling, and pain.  R. 318, 493.  The MRI showed disk desiccation at C2 through C5; moderate neural foraminal encroachment by disk bulge at C3-4 and C4-5; disk desiccation with degenerative changes, spondylosis, and anterior disk bulging with marked neural foraminal encroachment by disk bulge and joint hypertrophy bilaterally at C5-6 and

C6-7; and posterior disk bulging with broad-based herniation mildly impinging upon the spinal cord at C5-6.  R. 318-19, 493-94.  Dr. Ray referred Dippel to neurosurgeon Dr. Thomas Fulbright, M.D.

On November 14, 2011, Dippel saw Dr. Fulbright.  R. 484.  On examination, Dippel had tenderness in his right biceps and triceps that was "not particularly marked," diminished reflexes, and diminished sensation on the right side.   Gait and coordination were within normal limits.  R. 484. Dr. Fulbright ordered an epidural injection and referred Dippel to neurologist Dr. Douglas Dove, M.D., for nerve conduction and EMG studies.  R. 485.

On November 18, 2011, Dr. Dove performed nerve conduction and EMG studies on Dippel.  Dr. Dove found left carpal tunnel syndrome and "an asymmetrical right-sided mid cervical radiculopathic process involving both the C6 and C7 nerve roots resulting in a multilevel right-sided cervical radiculopathy involving the C6 and C7 nerve roots."  R. 300.

On December 3, 2011, Dippel went to the Emergency Room.  Dippel complained of chest pains.  He tested positive for cocaine on a urine test. A test for the presence of troponins was negative and an EKG did not show

any changes from a previous EKG.[2]  He was admitted to the hospital for

one night.  A stress test was negative.  He was discharged the next

morning, December 4, 2011.  The attending physician changed Dippel's

medicines in light of the positive cocaine test.  Dippel was also counseled

"for cocaine use and the risk he is taking secondary to coronary artery

disease."  R. 477.

On December 6, 2011, Dippel saw Dr. Fulbright.  Dr. Fulbright

recommended a 2-level cervical spinal fusion.  R. 479.  On December 21,

2011, Dr. Fulbright performed a two-level anterior cervical fusion at the C5-

C6 and C6-C7 levels. R. 467-71.  Dr. Fulbright prescribed Norco

(hydrocodone-acetaminophen) for pain.  R. 466.[3]

On December 19, 2011, Dippel's brother Gerald Dippel completed a

Function Report—Adult—Third Party Form.  R. 187-94.  Gerald Dippel

stated that Dippel lived in the basement of Gerald Dippel's home.  Gerald

Dippel stated that Dippel could not work because of "Arms going numb,

Dizzyness (sic), out of Breath on a regular Basis."  R. 187.  Gerald Dippel

reported that Dippel had constant pain.  Gerald Dippel stated that Dippel

---

[2] Troponins are proteins that are released into the blood during a heart attack.  See U.S. National Library of Medicine, MedlinePlus, Medical Encyclopedia, "Troponin Test," available at www.nlm.nih.gov/medlineplus/ency/article/007452.htm., viewed on October 1, 2015.
[3] Dr. Fulbright stated that he prescribed Vicodin.  R. 467.  The nurse's note on the refill of the prescription indicates that Norco was actually prescribed.  R. 466.  Both Norco and Vicodin are hydrocodone-acetaminophen pain relievers.  See Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 1290, 2055.

could take care of himself and dress himself except that he had difficulty putting on socks and difficulty shaving if his "arm goes numb."  R. 188. Gerald Dippel stated that Dippel did not do housework or yardwork. R. 189.  Gerald Dippel reported that he took Dippel grocery shopping once a month.  Gerald Dippel reported that Dippel had "trouble bending, using hands, lifting due to numbness in arms and legs."  Gerald Dippel opined that Dippel could not walk "very far," finish what he started, did not follow written instructions "very well," but followed spoken instructions better. R. 192.  Gerald Dippel opined that Dippel got along with most people, could handle changes in routine, but did not handle stress well.  R. 193.

On December 30, 2011, Dippel saw Dr. Fulbright for a post-operative follow-up examination.  Dr. Fulbright noted that Dippel was "doing fairly well."  Dippel reported some difficulty swallowing and some discomfort in his arm.  Dr. Fulbright noted that Dippel "overall seems to be improved." R. 465.

On February 1, 2012, Dippel saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  R. 390-95.  Dippel reported that he had shortness of breath.  He also reported that he recently had spinal fusion surgery.  He reported that since the surgery, his right shoulder would go numb and his neck did not feel right.  He reported that he was

told not to lift over ten pounds.  He reported pain in his neck when he walked.  He reported occasional blurry vision.  He reported shortness of breath on walking and occasional headaches.  He reported no chest pain. R. 390.

On examination, Dippel was in no acute distress.  Dippel's gait was normal, his lungs were clear, and his heart was in regular rhythm.  He had no muscle weakness or atrophy.  His reflexes were symmetric.  He had no joint redness, heat, swelling or thickening.  He showed no evidence of muscle spasms.  His grip strength was 5/5 bilaterally.  He could perform both fine and gross manipulations with both hands.  Tinel's sign was positive in both wrists.  Straight leg testing was negative bilaterally.  He could walk without an assistive device.  His lumbosacral spine flexion was normal.  He had slightly decreased range of motion in his cervical spine. Dr. Chapa found no evidence of congestive heart failure.  R. 392.

On February 1, 2012, Dippel also underwent x-rays of his cervical spine. R. 464.  Dr. Fulbright ordered the x-rays.  The x-rays showed postsurgical changes with hardware and spacing devices in place.  No abnormal movement was noted between the flexion and extension views. The x-ray also showed mild degenerative changes at the C4-5 level. R. 464.

On February 1, 2012, Dippel also called Walgreens pharmacy to get a refill on his prescription for 40 Norco tablets.  Walgreens called Dr. Fulbright's office because Dippel picked up refills for his Norco prescription on January 17, 2012, January 24, 2012, and January 27, 2012, and now wanted another.  The pharmacist notified Dr. Fulbright's office that the pharmacist told Dippel to call Dr. Fulbright.  The note in Dr. Fulbright's records does not indicate whether Dippel called Dr. Fulbright or whether the Norco prescription was refilled on February 1.  R. 461.

On February 3, 2012, Dippel saw Dr. Fulbright for a follow-up examination.  Dippel reported that he was improving.  Dippel told Dr. Fulbright that he felt a pop in his neck when he was getting out of a van and thereafter felt pain in his right shoulder "once again."  Dr. Fulbright noted that the February 1, 2012, x-rays showed good placement of the graft and no settling.  Dr. Fulbright recommended physical therapy.  R. 462.

From February 15, 2012, to March 7, 2012, Dippel underwent a course of physical therapy.  R. 425-41.

On February 21, 2012, state agency physician Dr. Young-Ja Kim, M.D., prepared a Physical Residual Functional Capacity Assessment. R. 414-21.  Dr. Kim opined that Dippel could lift twenty pounds occasionally and ten pounds frequently, stand and/or walk for six hours in an eight-hour

workday, and sit for six hours in an eight-hour workday.  R. 415.  Dr. Kim

opined that Dippel had no other physical limitations on his functional

capacity.  R. 416-18.  Dr. Kim noted that Dippel could perform fine and

gross manipulations and had 5/5 grip strength bilaterally.  Dr. Kim stated

that Dippel had no specific motor weakness, no evidence of joint redness,

heat, and swelling or thickening.  Dr. Kim also noted that Dippel's

December 2011 stress test was negative.  R. 421.

On March 7, 2012, the therapist made her final assessment of Dipple

at the end of his therapy.  The therapist's notes on March 7, 2012, stated,

in part, "Patient has good gains in postural strength and range of motion.

However, pain still persists at a high level.  Pt also reports cont[inued]

numbness and tingling."  Dippel reported to the therapist on March 7, 2012,

that his pain was at a 7 to 8 out of 10.  R. 441.

On March 16, 2012, Dippel did not show up for a scheduled

appointment with Dr. Fulbright.  Dippel, however, called Dr. Fulbright's

office to ask for Dr. Fulbright to call Walgreens to approve a refill on his

Norco prescription.  Dippel told Dr. Fulbright's nurse that he forgot about

the appointment.  Dr. Fulbright approved the refill, but told Dippel he had to

make his next appointment.  R. 459.

On March 26, 2011, Dippel saw Dr. Fulbright.  Dippel reported "quite a bit of pain in his right arm."  On examination, Dr. Fulbright found restricted range of motion in Dippel's neck, some weakness in the triceps, and "some weakness in grip bilaterally which appears to be due to poor input to motor testing."  Dr. Fulbright expressed concern about Dippel's use of narcotics. Dr. Fulbright told Dippel that a referral to pain management would be necessary before he would consider any more surgery.  Dr. Fulbright stated that he would repeat the x-ray and MRI studies.  R. 460.

On April 9, 2012, Dippel underwent an MRI and x-ray of his cervical spine.  The x-ray showed post-operative changes in cervical spine with no significant changes since the February 1, 2012, x-ray.  R. 451, 456.  The MRI showed moderate to marked neural foraminal encroachment at C3/C4; marked neural foraminal encroachment by uncovertebral joint hypertrophy on the right, with moderate neural foraminal encroachment on the left at C5/C6; and marked neural foraminal encroachment by uncovertebral joint hypertrophy on the right, with mild to moderate neuroforaminal encroachment on the left at C6/C7.  The radiologist's impression was post-operative changes in expected position and alignment and neural foraminal encroachment similar to that seen on October 27, 2011 MRI.  R. 448-50, 457-58.

On May 22, 2012, Dr. Dove performed another nerve conduction and EMG study.  R. 509.  On examination, Dr. Dove found "obvious evidence of persistent and progressive weakness of the right hand, particularly involving the thumb, index, and middle finger."  R. 509.  The studies showed marked abnormal denervation features identified in the mid to lower cervical parspinal region, as well as multiple muscles of the right upper limb in distinct nerve root distributions involving the C5, C6, and C7 nerve roots.  R. 509.  The study showed no evidence of more diffuse peripheral poly neuropathy or of any specific nerve entrapment, such as carpal tunnel syndrome or ulnar nerve syndrome.  R. 510.  Dr. Dove said the study was consistent with C5, C6, and C7 radiculopathy.  R. 511. Dr. Fulbright told Dippel not to work until his follow-up visit in August 2012. R. 518.

On June 22, 2012, state agency physician Dr. Charles Kenney, M.D., reaffirmed Dr. Kim's opinions on reconsideration.  R. 520-21.

On November 5, 2012, Dippel saw Dr. Fulbright.  Dippel reported weakness and tingling in his arms, but Dippel did not complain of pain.  On examination, Dr. Fulbright noted, "Motor examination is somewhat difficult to assess at this time.  There is poor input to grip testing.  More proximal strength appears symmetrical.  The reflexes are symmetrical."  R. 530.

Dr. Fulbright ordered x-rays of Dippel's neck.  The x-rays showed postoperative changes in expected position and alignment and degenerative changes.  R. 536.  Dr. Fulbright also reviewed the April 9, 2012, MRI and x-rays.  Dr. Fulbright noted, "I do not feel that there is any significant cord compression."  R. 530.  Dr. Fulbright opined that Dippel would not benefit further from any surgical intervention.   Dr. Fulbright released Dippel from his care at this time.  R. 530.

On February 25, 2013, Dippel went to the Emergency Room complaining of right shoulder pain.  R. 552.  On examination, Dippel had decreased range of motion due to his pain symptoms.  His radial pulse was positive and sensation was intact.  Dippel also reported having migraine headaches constantly.  R. 552.  Dippel reported having shoulder pain and migraines intermittently for years, but more frequently since his December 2011 surgery.  He rated his pain as 10 out of 10.  He reported taking Vicodin at home for the pain.  The emergency room attending physician reviewed the April 9, 2012, MRI of Dippel's cervical spine.  R. 553-55.  Dippel was sent home in good condition with a prescription of Flexeril.  He was told to continue the Vicodin as prescribed.  R. 555.

On March 8, 2013, Dippel saw Dr. Ray for neck pain.  R. 527-29.  Dippel reported that the neck pain had worsened.  He reported daily pain in

the cervical spine.  Dippel also reported numbness and tingling.  On examination, Dippel's cervical spine was tender and had moderately reduced range of motion.  Dippel also had decreased sensation and muscle strength in the right upper extremity.  R. 529.  Dr. Ray continued the Vicodin prescription and added a prescription for Neurontin for pain.  R. 527.

On May 7, 2013, Dippel went to the Emergency Room complaining of lower back pain.  R. 547.  Dippel reported that he had lumbar back pain that radiated into his right leg.  He reported that the pain was chronic but worsened the previous night.  Dippel reported that he had pinched nerves in his lumbar and cervical spine.  R. 547.  Dippel had no numbness or tingling.  R. 548.  On examination, Dippel had no pain with straight leg raise testing, his lumbar spine was mildly tender to palpitation, and he had normal range of motion in the extremities.  R. 549.  Dippel was assessed with acute exacerbation of chronic back pain and given an injection of Dilaudid.  R. 546, 548.  He was told to follow up with Dr. Ray.  R. 546.

On May 23, 2013, Dippel returned to the Emergency Room complaining of lower back pain.  Dippel was ambulatory with a steady gait. Dippel reported that the pain started "a couple of days ago."  R. 539. Dippel did not have any numbness.  Dippel's pain was rated as moderate.

Dippel did not have any chest pain or palpitations.  On examination, Dippel had a "band like lower back pain" with no tenderness, no focal pain, and no midline pain.  R. 540.  Dippel was given an injection of Dilaudid and discharged.  R. 540.

On August 2, 2013, Dippel went to the Emergency Room with complaints of chest pain.  On examination, Dippel had normal range of motion, no sensory deprivation, and a normal gait.  R. 578.  An EKG performed was negative.  R. 548.  Dr. Faisal Bukhari, M.D., admitted Dippel to rule out a myocardial infarction.  Stress tests were negative.  R. 547.  Dr. Bukhari adjusted Dippel's medications and discharged him on August 3, 2013.  R. 547.

On August 21, 2013, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 27-81.  The ALJ presided in Peoria, Illinois.  Dippel and his counsel appeared by video conference from Decatur, Illinois.  Vocational expert Randall Harding also appeared in Peoria.  R. 29.

Dippel testified first.  Dippel was single.  He testified that he normally weighed 180 pounds, but he currently weighed 212 pounds because of "stress and everything."  R. 32-33.  He lived in a house with his brother and sister-in-law and their adult son.  He lived in the basement.  He testified that he had difficulty climbing the stairs from the basement.  Dippel

testified, "Well, my legs feel like they're going to give out, so I'll hold onto the wall."  R. 33.  Dippel testified that he was supposed to get a cane but could not afford it.  R. 33-34.

Dippel did not have a driver's license.  He testified that he had not driven since 1994.  R. 34.  Dippel testified that his brother drove him to do errands. Dippel testified that he also sometimes took public transportation. R. 35.

Dippel denied ever using cocaine.  Dippel testified, "I have never used cocaine.  I was at a party one time and the people put stuff in, but as far as using it, no."  R. 36.  Dippel testified that he had not had a beer in six months.  R. 36.

Dippel quit school after completing the tenth grade.  He did not secure a GED.  Dippel testified that he could read and that he could write "to a certain extent."  He could also add and subtract.  R. 37.

In 1999, Dippel lived in Florida and worked in an automotive repair facility.  Dippel performed oil changes and checked brakes.  Dippel lifted a maximum of fifty pounds in that job.  Dippel left that job when he moved from Florida back to Decatur, Illinois.  R. 39-40.  From 2007 to 2009, Dippel also worked assembling radiators for graders.  Dippel testified that he lost that job because of his heart attack in 2008.  He testified, "I had a heart

attack in 2008 and when I went back, 2009, they got rid of me . . . ."  R. 40.

In 2010, Dippel worked for about a month making molds at a place called

Nortrac.  He testified that he stopped working that job because he again

had heart problems.  R. 40.  Dippel testified that thereafter no one would

hire him because of his health problems.  R. 41.

The ALJ asked Dippel why he could not work as a laborer or

mechanic.  Dippel testified:

> It's my standing, my sitting, my walking, my lifting, my reaching,
> my carrying, my handling, kneeling, crouching, bending, and my
> fingers, all that.  If I tried to do anything, it just don't come
> through.

R. 43.

Dippel testified about his neck surgery in December 2011.  Dippel

stated that the problem started in his right arm:

> It was just my right arm.  It just started real pain and everything
> and I couldn't – if I moved, all the pain shot up to my right side
> of my neck and I couldn't do anything, lift anything.  And then
> they sent me to the hospital to get it checked and then that's
> when they recommended me to Mr. Fulbright.
>
> . . . .
>
>  [The pain] was a 10 or better. Ten, probably like a 15 pain
> wise.  It was so severe, I couldn't think or anything right."
> R. 44.
>
> . . . .

[The pain] was just slowly was building and all of a sudden it
just hit me like a ton of bricks, all at one time.  All the pain just
started at one time.

R. 44.

Dippel testified that the surgery relieved his pain for about a week,

"And I'd say it was about a week it was doing fine, after that it went right

back to where it was.  The pain and just before, it went back to where it

was before the surgery."  R. 45.

Dippel's attorney asked Dippel about an incident when he felt a pop

in his neck when he stepped out of his brother's van.  Dippel testified, "Yes.

When I stepped down, I stepped down and my leg twisted and I thought it

popped back here.  I went back in again, that's when they sent me back to

Mr. Fulbright."  R. 45.  Dippel testified that physical therapy did not help at

all.  R. 45.  Dippel testified that the doctor who performed the nerve

conduction study told him that he had a pinched nerve in his neck after the

surgery.  R. 46.

Dippel testified about his heart.  He testified that the doctors at his

August 2013 hospital visit told him that his heart was swollen.  He testified

that he had chest pain from the swelling.  R. 47.  Dippel testified that his

chest pain comes and goes.  He testified that the doctor told him he had

pleurisy.  R. 48.

Dippel then testified about his physical limitations.  He testified about his problems standing and sitting:

> If I stand, it just feels like I lose balance, feel my legs want to give out.  Then when it does that, I'll sit.  I'll sit for a little bit. And then my legs will get to hurting and my arms and I'll try to stand to try to [INAUDIBLE] the pain, but it just don't work.

R. 48.  Dippel testified that he experienced pain on his left side if he moved the wrong way, "It's pain if I turn it wrong or anything, it just shoots straight up to here, to my neck."  R. 49.  Dippel testified that he had difficulty standing up from a seated position in a chair.  He testified that he had to brace himself and put his weight on one side and push himself up.  R. 49.

Dippel testified that he experienced pain if he turned his head, "If I turn my head to the right or left, it just pain.  It just goes right back through the arms and everything.  It I turn it wrong to a certain way, it goes straight up to the brain."  R. 49.  Dippel testified that he kept his head down to avoid pain, "If I try to hold my head up too long, it hurts.  That's why I try to keep it down.  It eases the pain a little."  R. 49.  Dippel testified that the doctors told him that there was nothing they could do to relieve his neck pain. R. 50.

Dippel testified that he could stand for about three or four minutes before his legs "want to give out."  He testified that he could walk two blocks before he needed to rest.  Dippel testified that he could sit in the

same position for about forty minutes.  He testified that moving around while seated would ease the pain slightly, "but it don't help much."  R. 50.

Dippel testified that he had problems reaching, "Well, if I go to try to reach or anything with – grab or I have no grab or grip, so to try to reach is just, I mean, it's just pain.  Any pressure to do with this nerve, if I try any movement with it."  Dippel testified that he had problems even just reaching out in front of himself.  Dippel testified that he could not raise his arms over his shoulders because of the pain, "It about sends me through the ceiling.  It just hits that nerve and the pain shoots."  R. 51.

Dippel testified that he had problems with his right hand due to the fracture and due to carpal tunnel:

> The right hand [fracture happened] a year and a half ago.  And with the carpel tunnel, they said this one would eventually close.  This one here, I got carpel tunnel in this one, but as far as this one, they said it would eventually close.
> . . . .
>
> This like, I can't hold nothing.  If I try to hold something, I'll end up dropping it.  And I don't have no grip.  I can't grip nothing with it.  If I try to go like this or anything, I can't hold it.
> . . . .
>
> Oh, I mean, if I try to grab something and try to lift up, –
> . . . .
>
> – it just drops because I don't – I can't –

R. 52.

Dippel testified that he could not use his fingers for typing or writing:

With my right arm being [numb] 24 hours a day, it just – it I try, it just starts hurting and then the numbness jumps in twice as much.
. . . .

[The numbness] just got the burning, the tingling, and then the pain with it.

R. 52.  Dippel testified that he had no feeling in his right arm.  He testified, "I went to the hospital, they give me a shot.  They stuck the needle in me far, I didn't feel it."  R. 53.

Dippel testified that his left arm was also going numb, "It's starting to now, but here the last, I'd say, couple weeks it's been – this one's been getting numb, too, but the pain, it's getting about the right, almost close to it on the right."  R. 53.

Dippel testified that he could not lift at all.  He testified he could not lift a pound with his right hand without pain, "With this one, I can't even – not even five pounds.  I try to lift a pound and it's like – I just can't do it because if I try – the more pressure I put, goes straight up right to the nerve."  He testified that he could not lift with his left hand either, "This one?  Not hardly.  This has always been my bad one since I was little and this one's about almost the same.  If I try to lift with both of them, I can't."  R. 53.

Dippel testified that, "I can't grab, grip, or anything to try to lift or anything."
R. 55.

Dippel testified about his fractured right hand.  He testified that they
put three pins in him to set the fracture.  He testified that when he woke
one morning sometime after the surgery, he saw one of the pins was
"sticking out of my hand."  He testified that the surgeon told him "that was
natural."  R. 53.  He testified that the surgeons removed the pins, but told
him that "I was done with them."  He testified, "They said there wasn't
nothing else they could do.  That it was healed and I've got checked since
then and they said it's still fractured."  R. 54.

Dippel testified that he had difficulty sleeping because of the pain.  He
testified that he usually slept about three hours a night.  R. 55.  He testified
that he took naps during the day because he became tired easily.  R. 56.

Dippel testified that in a typical day, he got up about 7:30 a.m.  He
testified that he took about an hour to get motivated enough to get out of
bed.  Once he got up, he would go outside for a walk.  He would walk and
then sit and rest and then walk some more for, "usually a couple of hours."
R. 56-57.  He then would go back inside and sit and watch television.  He
would fall asleep in front of the television.  He estimated that he slept for an
hour during the day.  R. 58.

Dippel testified that he did not do any household chores.  He testified that he tried various chores, but could not perform them.  R. 59-61.  He testified that he tried to do laundry, but it took two hours.  He could not lift the laundry basket; rather, he kicked and pushed the basket across the floor with his legs and feet.  R. 61.  He testified that the last time he mowed the yard was June of 2012.  R. 64.  Dippel later testified that he last mowed the yard before his neck surgery.  R. 69.  He testified that he was not able to shovel snow.  R. 64.

Dippel testified that bathing and dressing took longer.  R. 61.  He testified that he had difficulty with buttons.  R. 61-62.  Dippel testified that he did not go out.  He testified that he could use a microwave to prepare food.  He testified that he had trouble opening plastic packaging.  R. 62-63.

Dippel testified that he read car magazines.  He received car magazines in the mail twice a week.  He did not use a computer or play video games.  R. 63.

Dippel testified that his brother took him grocery shopping.  He testified that shopping took a while, "I go through, but it takes me a while.  But, yes.  If something's heavy, my brother grabs it."  Dippel testified that he did not go shopping by himself.  R. 67.

The ALJ asked Dippel if any doctor put a restriction on the weight he could lift.  Dippel testified that Dr. Fulbright limited him to five pounds while he was undergoing physical therapy.  He testified that Dr. Fulbright later limited him to lifting ten pounds.  Dippel testified that he could not lift ten pounds.  R. 67-68.

Vocational expert Harding then testified.  The ALJ asked Harding the following hypothetical question about a person with Dippel's age, education and work experience:

> Initially, I'd like for you to assume that this individual could lift up to 20 pounds occasionally, 10 pounds frequently.  The individual should never climb ladders, ropes, or scaffolds; no more than occasionally climb ramps or stairs; no more than occasionally balance, stoop, kneel, crouch, or crawl.  The individual should no more than occasionally reach overhead bilaterally.  Given those limitations, would such an individual be able to return to any of the claimant's past work?

R. 72.  Harding answered, "No, your honor."  R. 72.

Harding opined that such person could perform other jobs, such as bench assembly small parts, with 1,000 such jobs in Illinois, and 40,000 nationally; sub assembler, electrical, with 300 such jobs in Illinois and 15,000 nationally; clerical router, with 400 such jobs in Illinois and 20,000 nationally.  Harding opined that these three jobs were representative of the types of jobs the person could perform and not an exclusive or exhaustive list.  R. 72-23.

Harding also opined that such a person could perform sedentary jobs of documents preparer, with 300 such jobs in Illinois and 15,000 nationally; addresser/addressing clerk, with 500 such jobs in Illinois and 25,000 nationally; and assembly, bench, with 400 such jobs in Illinois and 20,000 nationally. Harding opined that these three jobs were also representative of the types of jobs the person could perform and not an exclusive or exhaustive list. R. 74.

The ALJ asked Harding to consider the effect on the possible jobs if the hypothetical person was limited to frequent handling and fingering bilaterally. Harding opined that the person could still perform all of the jobs he identified. R. 74-75. Harding opined that if the person was limited to occasional fingering and handling, he could not perform any of the identified jobs. R. 75.

At the close of the evidence, Dippel's attorney made a closing statement. The hearing then concluded.

## THE DECISION OF THE ALJ

On September 19, 2013, the ALJ issued her decision. R. 11-21. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that he is disabled regardless

of his age, education and work experience.  20 C.F.R. §§ 404.1520(d),

416.920(d).  To meet this requirement at Step 3, the claimant's condition

must meet or be equal to the criteria of one of the impairments specified in

20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§

404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the

ALJ proceeds to Step 4 of the Analysis.

Step 4 requires a determination of whether the claimant can return to

his prior relevant work considering his age, education, work experience,

and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and

(f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then

Step 5 requires a determination of whether the claimant is disabled

considering his RFC, age, education, and past work experience.  20 C.F.R.

§§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has

the burden of presenting evidence and proving the issues on the first four

steps.  The Commissioner has the burden on the last step; the

Commissioner must show that, considering the listed factors, the claimant

can perform some type of gainful employment that exists in the national

economy.  20 C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649

F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d

345, 352 (7th Cir. 2005).

The ALJ also considered the relevant time frame for determining

eligibility for SSI benefits.  A claimant may be entitled to SSI benefits

regardless of work history or dates of insurance; however, he may only be

eligible to receive benefits commencing on the date he applied for SSI

benefits. 20 C.F.R. § 416.335.  Dippel applied for SSI benefits on

November 16, 2011.  R. 11.

The ALJ found that Dippel met his burden at Steps 1 and 2.  The ALJ

found that Dippel had not engaged in substantial gainful activity since

November 16, 2011, and he suffered from the severe impairments of

cervical degenerative disc disease with residual radiculopathy in the

bilateral extremities, and ischemic heart disease.  R. 13.

At Step 3, the ALJ found that Dippel's impairments or combination of

impairments did not meet or equal a Listing.  R. 14.  The ALJ considered

Listing 1.04 for disorders of the spine, and Listing 1.02 for upper

extremities.  The ALJ stated:

> There is no evidence of nerve root compression characterized
> by neuro-anatomic distribution of pain, limitation of motion of

the spine, motor loss accompanied by sensory re reflex loss
and positive straight-leg raising test; spinal arachnoiditis; or
lumbar spinal stenosis resulting in pseudoclaudication with the
inability to ambulate effectively, as required by section 1.04.
Further, there is no evidence of inability to ambulate effectively
as defined in 1.00B(2) and required by section 1.02A or
involvement of one major peripheral joint in each upper
extremity resulting in inability to perform fine and gross
movements effectively as defined in section 1.00B(2)(c) and
require by section 1.02B.  The claimant has been noted to be
able to walk without the use of any assistive devices and to
perform fine and gross manipulations with his hands [citation to
Dr. Chapa's examination report].

R. 14.  The ALJ also considered Listing 4.04 for ischemic heart disease.

The ALJ found that Dippel did not meet or equal this listing because of the

negative EKG testing, negative stress test, and echocardiogram results

from the December 2011 and August 2013 hospitalizations.  R. 14.

At Step 4, the ALJ found that Dippel had the RFC to perform a limited

range of light work:

After careful consideration of the entire record, the
undersigned finds that the claimant has the residual functional
capacity to perform light work . . . except: the claimant can lift
20 pounds occasionally and ten pounds frequently; the claimant
can never climb ladders, ropes, scaffolds; the claimant can
occasionally climb ramps and stairs, balance, stoop, kneel,
crouch, and crawl; the claimant can no more than occasionally
reach overhead bilaterally; and the claimant can no more than
frequently handle and finger."

R. 14.  The ALJ relied on the medical examinations that showed:

The claimant has been generally noted to have 5/5 strength of
the right shoulder and elbow; no muscle atrophy; intact

sensation to the upper and lower extremities; symmetric reflexes in the upper and lower extremities; no muscle spasm; 5/5 handgrip strength; the ability to perform fine and gross manipulations with the hands; normal lumbar spine flexion; full range of motion of all the joints; and the ability to ambulate with a steady gait without the use of any assistive devices.  These functional abilities are consistent with the ability to perform a very broad range of light work.

R. 17-18  (internal citations to the record omitted).  The ALJ cited

Dr. Chapa's report (R. 390-94), as well as medical records from

examinations of Dippel on February 15, 2012(R. 426); September 7, 2012

(R. 570); November 29, 2012 (R. 564); December 31, 2012 (R. 558);

February 25, 2013 (R. 552); May 7, 2013 (R. 547, 549); May 23, 2013

(R. 539);  and August 2, 2013 (R. 575).  R. 18.[4]  The ALJ also relied on the

opinions of agency physicians Drs. Kim and Kenney.  R. 19.

In making this finding, the ALJ found that Dippel's testimony about

the debilitating nature of his pain and impairments was not credible.  R. 15-

19.  The ALJ summarized Dippel's testimony.  R. 17.  The ALJ then

reviewed the medical evidence and found that his claims were inconsistent

with the medical records after his surgery that found 4/5 or 5/5 strength in

his extremities, full range of motion in his joints and extremities, a steady

gait, a lack of numbness, and an ability to walk effectively.  R. 16-18.  The

---

[4] The ALJ cited the record with the designations used at the administrative level.  R. 17-18 (citing 7F p. 5; 3F; 17F pp. 3, 11, 13, 16, 22, 28, 34; and 18F p. 5).

ALJ also noted that Dr. Fulbright observed that Dippel "gave poor input to the grip testing."  R. 18.  The ALJ also found Dippel's statement that he needed a cane not credible because "he has consistently been noted to be able to ambulate without the use of any assistive devices."  R. 18 (citations to the record omitted).

The ALJ put little weight on Dr. Fulbright's note directing Dippel to stay off work until August 2012.  The ALJ viewed that as a temporary restriction while Dippel was healing and not an indication of a permanent disability.  R. 20.  The ALJ found nothing in the record to support Dippel's testimony that Dr. Fulbright thereafter limited him to lifting ten pounds. R. 18.

The ALJ also noted that Dippel's cardiac tests from December 2011 and August 2013 were all essentially normal.  R. 19.  The ALJ found that the limitation to light work was consistent with these medical findings. R. 19.

The ALJ also considered the Function Report—Adult—Third Party form completed by Dippel's brother Gerald Dippel.  The ALJ found the statement about the intensity, persistence and limiting effects of Dippel's impairments not credible.  The ALJ found Gerald Dippel's statement to be inconsistent with the medical findings discussed above.  R. 19.

The ALJ found at Step 4 that Dippel had no relevant work.  R. 20.

At Step 5, the ALJ found that Dippel could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Harding that a person with Dippel's age, education, work experience, and RFC could perform the representative jobs of bench assembly small parts; sub assembly, electrical; document preparer; addressor; and assembly bench.  The ALJ found that Dippel was not disabled.  R.21.

Dippel appealed.  On December 3, 2014, the Appeals Council denied Dippel's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Dippel then brought this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  <u>Delgado v. Bowen</u>, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility
determinations of the ALJ unless the determinations lack any explanation
or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.
2008).  The ALJ must articulate at least minimally her analysis of all
relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).
The ALJ must "build an accurate and logical bridge from the evidence to his
conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The
findings in Step 3 are supported by the medical evidence.  Listing 1.04 for
spine conditions requires:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus,
> spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative
> disc disease, facet arthritis, vertebral fracture), resulting in
> compromise of a nerve root (including the cauda equina) or the
> spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-
> anatomic distribution of pain, limitation of motion of the spine,
> motor loss (atrophy with associated muscle weakness or
> muscle weakness) accompanied by sensory or reflex loss and,
> if there is involvement of the lower back, positive straight-leg
> raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or
> pathology report of tissue biopsy, or by appropriate medically
> acceptable imaging, manifested by severe burning or painful
> dysesthesia, resulting in the need for changes in position or
> posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.04.  The ALJ's conclusion that Dippel's impairments did not meet this Listing is supported by substantial evidence.   Dippel did not suffer from lumbar spinal stenosis or spinal arachnoiditis, so Listings 1.04B and 1.04C do not apply.  Dippel had radiculopathy in the cervical spine, but there is no evidence of any atrophy, and Dr. Chapa found no muscle weakness.  Straight leg raising tests were negative by both Dr. Chapa in February 2012 and the Emergency Room in May 2013.  Dippel also could walk without an assistive device.   Substantial evidence supported the ALJ's conclusion that Dippel did not meet or equal this Listing.

Listing 1.02 for upper extremity joints provides:

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

. . . .

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.02.  Dippel's medical records show no joint pain and stiffness, and the records do not contain any imaging of his upper extremities that shows joint space narrowing, bony destruction, or ankyloses of any joint.  Also, Dr. Chapa found that Dippel could perform both fine and gross movements with both hands. Substantial evidence supports the ALJ's conclusion that Dippel's condition did not meet or equal this Listing.

The RFC finding at Step 4 is also supported by substantial evidence. Dr. Chapa's examination showed normal strength, full range of motion in all joints, normal range of motion in the lumbar spine, and no muscle weakness, atrophy, or spasms.  Drs. Kim and Kenney opined that Dippel could perform a large range of light work.  The negative stress tests and negative EKG tests also support the RFC finding.

At Step 5, the RFC finding and the opinions of vocational expert Harding support the conclusion that Dippel was not disabled.

Dippel argues that the ALJ improperly cherry-picked the evidence at Step 3 without considering contrary evidence.  Brief in Support of Motion

for Summary Judgment (d/e 14), at 11;  see Bates v. Colvin, 736 F.3d 1093, 1099 (7th Cir. 2013).  The Seventh Circuit used the term "cherry-picked" to describe taking statements in the medical record out of context. In Bates, the ALJ cited the statement in a mental examination note that the claimant had "relevant thought process" but ignored the statements in the same note that the claimant was "tearful, anxious and isolated, suffering from insomnia, depressed, and had a constricted affect."  Id.  The ALJ in this case did not take statements out of context from any of the relevant imaging studies or EMG and nerve conduction studies.  The ALJ also did not take other statements relevant to the Step 3 analysis out of context. The ALJ gave more weight to some medical evidence, particularly Dr. Chapa's examination, but she did not cherry-pick the evidence in the manner described in Bates.

Counsel for Dippel bases his "cherry-picking" argument on the records of Dr. Fulbright and Dr. Dove.  (d/e 14, 11-13).  The RFC decision of the ALJ was based on the totality of the evidence, not on the opinions and observations of two doctors.  R. 14-19

The ALJ is supposed to weigh the evidence, and this Court does not reweigh the evidence.  See Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004).  The ALJ adequately considered the medical evidence.

Dippel relies heavily on Dr. Dove's May 2012 examination and the April 12 MRI.  These tests showed degenerative changes in Dippel's spine, but did not show the degree of degenerative changes set forth in Listing 1.04, quoted above.  The ALJ did not engage in cherry-picking the record and did not commit error at Step 3 of the Analysis.

Dippel argues that the ALJ erred in his credibility determination. Dippel argues that the ALJ improperly discounted Dippel's claims of pain because he did not have objective medical evidence to prove his level of pain.  The Seventh Circuit has held that an ALJ errs in discounting claims of pain just because objective medical tests do not confirm the claims.  See Hall v. Colvin, 778 F.3d 688, 691 (7th Cir. 2015); Adaire v. Colvin, 778 F.3d 685, 687 (7th Cir. 2015).

The ALJ, however, did not reject Dippel's claims of pain because he lacked an objective medical test to prove the pain.  The ALJ found Dippel's testimony about his functional limitations due to his pain was not credible because his testimony was contradicted by the medical evidence, primarily Dr. Chapa's examination.  Dippel testified that due to his pain, he could not lift his arms above his shoulders, had no grip strength, and could not lift five pounds.  R. 51-55.  Dippel also testified that he was supposed to get a cane to walk.  R. 33-34.  The ALJ noted that Dr. Chapa found no muscle

weakness or atrophy, full range of motion in all joints, no joint redness or swelling, no evidence of muscle spasms, 5/5 grip strength bilaterally, and the ability to walk without an assistive device, and normal range of motion in the lumbar spine.  R. 392.  In addition, the ALJ cited a physical therapy note from February 15, 2012, that showed at least 4/5 strength in the right shoulder and arm and 5/5 strength in the left (R. 426); and numerous medical examinations that showed the ability to ambulate effectively without the use of an assistive device.  The ALJ also cited Dr. Fulbright's observations that there was "poor input into grip testing" by Dippel.  R. 530.  This is not a case in which the ALJ relied on a lack of objective medical evidence of pain.  This is a case in which the ALJ found that the medical evidence contradicted Dippel's testimony.  This Court will not review credibility determinations if they are supported by evidence in the record.  Elder, 529 F.3d at 413-14.  The credibility determination was supported by substantial evidence.

THEREFORE this Court recommends Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 16) should be ALLOWED, Plaintiff Donald L. Dippel's Motion for Summary Judgment (d/e 13) should be DENIED, and the decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   February 25, 2016

_____*s/ Tom Schanzle-Haskins*_____
UNITED STATES MAGISTRATE JUDGE